The Honorable Brian D. Lynch
Chapter 11
Location of Hearing: Via Telephone
Date of Hearing: To be Determined
Time of Hearing: To be Determined
Response Date: At or Before Hearing

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| In re:<br><br>SHILO INN, OCEAN SHORES, LLC, *et. al.,*[1],<br><br>    Debtors and Debtors-in-Possession, | Proposed Lead Case No. 20-42348<br><br>(Proposed Jointly Administered with Case No. 20-42349)<br><br>DECLARATION OF LARRY CHANK IN SUPPORT OF FIRST-DAY MOTIONS |

I, Larry Chank, hereby declare as follows:

1.    I am over 18 years of age. I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.

2.    I am currently employed as the CEO of Shilo Management Corporation ("SMC"), which is the manager and operator of the Hotels (as defined below) owned by Shilo Inn, Ocean Shores, LLC ("Shilo Ocean Shores") and Shilo Inn, Nampa Suites, LLC ("Shilo Nampa Suites") (each a "Debtor" and, collectively, the "Debtors") the debtors and debtors in possession in the above-captioned, proposed jointly-administered chapter 11 bankruptcy cases.

3.    I have reviewed and am familiar with and am knowledgeable about the books and records of SMC and the Debtors, which books and records are made in the regular practice of

---

[1] The Debtors are Shilo Inn, Ocean Shores, LLC, Bankruptcy Case No. 20-42348 and Shilo Inn Nampa Suites, LLC, Bankruptcy Case No. 20-42349.

DECLARATION OF LARRY CHANK IN
SUPPORT OF FIRST-DAY MOTIONS - 1

**STOEL RIVES LLP**
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
*Telephone 206.624.0900*

103715353.1 0070625-00002

business, kept in the regular course of business, made by a person with knowledge of the events and information related thereto, and made at or near the time of events and information recorded.

4.     I was hired as CEO of SMC in February 2019, in which role I have continued to serve to this present day.  I am the authorized agent for the Debtors in their respective chapter 11 bankruptcy cases.

5.     I began my hospitality career in 1988 and have hands-on experience in hotel & restaurant operations (15 years) and accounting/finance (49 years).  I am a 1970 graduate of Niagara University, Niagara Falls, New York, with a BBA in accounting and service as a Lieutenant in the Army Artillery.  Prior to Shilo Inns, my position was the CFO/Controller for the Hopi Tribe Economic Development Corporation, and,  in addition to my accounting duties, this position allowed me to advise the Hopi Tribe on matters related to operation of their residential, commercial, hotel, restaurant, travel plaza, and other real estate developments.  I have a Certified Public Accountant license issued in the State of New York, and I am a licensed real estate broker in the State of California.

6.      My duties have included the management and oversight of accounting personnel, including Accounts Payable, Accounts Receivable, Payroll, General Ledger, Audit, Treasury, Budgets, Cash Flow, Financial Reporting, Human Resources, and Information Systems.

7.     I make this declaration in support of the Debtors' "first day motions" (each a "Motion" and, collectively, the "Motions") listed here as follows:

    a.   Debtors' Emergency Motion for Entry of an Order Authorizing Debtors to: (A) Use Cash Collateral on an Interim Basis Pending a Final Hearing; and (B) Setting a Final Hearing (the "Cash Collateral Motion");

    b.   Debtors' Emergency Motion for Entry of an Order Authorizing the Continued Use of Debtors' Cash Management Systems (the "Cash Management Motion");

DECLARATION OF LARRY CHANK IN
SUPPORT OF FIRST-DAY MOTIONS - 2

103715353.1 0070625-00002

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

Case 20-42348-BDL     Doc 21     Filed 10/16/20     Ent. 10/16/20 22:24:20     Pg. 2 of 26

c. Debtors' Emergency Motion for Authority to (1) Pay Prepetition Wages, Commissions and Bonuses; and (2) Honor Accrued Vacation and Leave Benefits in the Ordinary Course of Business (the "Wage Motion");

d. Debtors' Emergency Motion for Entry of an Order Authorizing Debtors to Provide Adequate Assurance of Future Payment to Utility Companies Pursuant to Section 366(c) of the Bankruptcy Code (the "Utilities Motion");

e. Debtors' Emergency Motion for Entry of an Order Authorizing Debtors to Honor Certain Prepetition Obligations to Customers (the "Customer Loyalty Program Motion"); and

f. Debtors' Emergency Ex Parte Motion for Entry of an Order Jointly Administering the Debtors' Cases (the "Joint Administration Motion").

## I.      GENERAL INFORMATION

### A.      General Information

8.      The Debtors commenced their respective chapter 11 bankruptcy cases by each filing a voluntary petition under chapter 11 of title 11, sections 101 *et seq.* of the United States Code, (the "Bankruptcy Code") on October 15, 2020 (the "Petition Date").

9.      The Debtors continue to operate their businesses and manage their financial affairs as debtors in possession. No committee of unsecured creditors has been formed, and no trustee has been appointed.

### B.      The Two Hotels

10.      Mark S. Hemstreet has been the proud founder and owner and of the Shilo Inn Suites Hotel chain since 1974. Today, there are fourteen (14) company-owned Shilo Inn hotels across the western states, including one Shilo hotel in Killeen, Texas.

11.      Each of the two Debtors owns a hotel (each a "Hotel" and, collectively, the "Hotels"), as described in greater detail below.

DECLARATION OF LARRY CHANK IN
SUPPORT OF FIRST-DAY MOTIONS - 3

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

103715353.1 0070625-00002

Case 20-42348-BDL      Doc 21      Filed 10/16/20      Ent. 10/16/20 22:24:20      Pg. 3 of 26

1         12.    The Hotels are collateral for a certain promissory note (the "Loan") originally

2  made in November 2015 and now held by RSS WFCM2016NXSS-WA SIOSN, LLC, a

3  Washington limited liability company (the "Lender") and serviced by Rialto Capital Advisors,

4  LLC ("Rialto").

5         13.    Shilo Ocean Shores operates a 113-all suites, 4-story, full-service ocean front

6  hotel in Ocean Shores, Washington (the "Ocean Shores Hotel"), on fee title land, operated

7  pursuant to a franchise agreement with Shilo Franchise International, LLC ("SFI") and managed

8  by Shilo Management Corporation ("SMC"). The Shilo Ocean Shores full service ocean front

9  hotel property has an indoor pool, spa, steam and sauna room, fitness and business center, and

10  two meeting rooms, as well as a restaurant and lounge. The restaurant and lounge are currently

11  closed as a result of COVID-19. The Ocean Shores Hotel has approximately  20 employees.

12  Based on the appraisal opinion of Mark Hemstreet, the fair market value of the Ocean Shores

13  Hotel is at  least $15,000,000.

14        14.    Shilo Nampa Suites operates a 84-all-suites, four-story, limited-service hotel in

15  Nampa, Idaho (the "Nampa Suites Hotel"), on fee title land, operated pursuant to a franchise

16  agreement with SFI and managed by SMC. The Shilo Nampa Suites property has an indoor

17  pool, spa, sauna, and steam room, fitness and business center and meeting room, plus a free

18  standing restaurant and lounge facility that is leased out to an independent third party tenant

19  lessee.  The Nampa Suites Hotel has approximately  21 employees.  Based on the appraisal

20  opinion of Mark Hemstreet, the fair market value of the Nampa Suites Hotel is at least

21  $7,000,000.

22        15.    Based on the foregoing valuations, the current fair market value of the Hotels, in

23  the aggregate, is approximately $22,000,000.  As discussed in greater detail below, the total

24  secured debt owing to the Lender is approximately $9,200,000, which is secured by the Hotels.

25  As a result, the Debtors submit that their estates benefit by substantial equity cushions, which

26

DECLARATION OF LARRY CHANK IN
SUPPORT OF FIRST-DAY MOTIONS - 4

**STOEL RIVES LLP**
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

103715353.1 0070625-00002

Case 20-42348-BDL   Doc 21   Filed 10/16/20   Ent. 10/16/20 22:24:20   Pg. 4 of 26

1  will allow the Debtors to propose a successful plan of reorganization and pay 100% of the

2  allowed claims of all creditors.

3         16.    The Hotels have enjoyed historical success as stand-alone businesses leading up

4  to 2020. The Nampa Suites property has had a small decline in hotel revenues in 2019, due to

5  irrational over building in the local hospitality market place, but still maintained a higher net-

6  operating-income profit bottom line.  Despite these challenges, the Debtors continued to

7  maintain the properties in first-class, excellent condition and in compliance with Shilo Inn

8  franchise standards.  Unfortunately, in 2020 the Hotels experienced a sudden and sharp decline

9  in hotel revenues due to the Covid-19 global pandemic and unprecedented global recession.

10        **C.     The Hotels Secured by Loans with the Lender**

11        17.    On or about November 2, 2015, each of the Debtors entered into loan agreements

12 with Natixis Real Estate Capital, LLC ("Natixis").   On information and belief, Natixis

13 collateralized the Loan into commercial mortgage backed securities and sold it as investments in

14 the market.   The Loan was being serviced by Wells Fargo prior to being moved to special

15 servicing with Rialto in or about September 2018.  Mark S. Hemstreet, founder of Shilo Inns, is a

16 personal guarantor on the Loan, personally guarantying 5% of the debt, which then sprung to

17 100% of the debt when he, as an officer, director, and member of the Debtors, did not prevent

18 them from filing for bankruptcy protection.

19        18.    The Debtors made timely payments on the Loan for three years until the third

20 quarter of 2018.  Despite what might appear to be a better economy on Wall Street with record

21 Dow Jones stock averages, the general American economy has continued to be a struggle for

22 America's working class, which continues to have reverberations in the markets serving

23 America's working class families.  Shilo Inn has a long and proud 46-year-plus history of

24 providing high quality resort, hotel, and vacation services to American families in the Pacific

25 Northwest, and several western states, including Washington, Oregon, Idaho, Montana, Arizona,

26 Nevada, and Texas.  Shilo Inn has been a strong supporter and charitable donor to the service

DECLARATION OF LARRY CHANK IN
SUPPORT OF FIRST-DAY MOTIONS - 5

103715353.1 0070625-00002

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

Case 20-42348-BDL    Doc 21    Filed 10/16/20    Ent. 10/16/20 22:24:20    Pg. 5 of 26

men and women of the United States Armed Forces, and Shilo is proud of its commitment to America's men and women in uniform and America's working class. As America's working class continued to struggle through this economy, the Debtors nonetheless made timely debt service to the Lender for three years. But when the economic conditions strained the ability to make payments in late 2018, the Lender took increasingly aggressive steps to foreclose on the Debtors' assets.

19.    For twelve months from September 2018 to September 2019, the Debtors made numerous offers to the Lender and Rialto in efforts to bring current and reinstate the Loan through settlement. The Lender's and Rialto's responses were often slow, vague, and incomprehensible to the Debtors. Reinstatement figures from Rialto would include categories of fees and expenses that were inconsistent between the multiple Debtors, included footnoted exceptions to allow for the reinstatement figures to change with additional charges without limit, and included shockingly high default charges, penalties, fees, and costs that went well beyond basic attorneys' fees. Moreover, in the approximate 24 months leading up to the bankruptcy filings, Rialto would seize most of the Debtors' operating cash accounts under a lockbox cash management provision, making it very challenging for SMC and SFI to operate the hotels. Rialto collected all of the operating cash that Shilo created and insisted that the Debtors' affiliates Shilo Management Corporation (SMC), Shilo Franchise International, LLC (SFI) and Mr. Hemstreet personally pay for all of the expenses, including, but not limited to, for example, labor, payroll, utilities, insurance, vendors, supplies, and taxes at the Hotels rather than use the Debtors' own generated operating cash and reserves to pay its own expenses. The Debtors were required to submit monthly operating expense ("Opex") draw requests at the end of each month and then have to wait at least another forty five (45) days to ever receive reimbursement, resulting in SMC, SFI and Mr. Hemstreet having to advance and fund millions of dollars causing more financial hardship on the debtors, SMC, SFI and Mr. Hemstreet. On August 6, 2019, the Debtors learned that Rialto had seized over $1,525,000 of the Debtors' cash on August 2, 2019, from the

DECLARATION OF LARRY CHANK IN
SUPPORT OF FIRST-DAY MOTIONS - 6

103715353.1 0070625-00002

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
*Telephone 206.624.0900*

Case 20-42348-BDL    Doc 21    Filed 10/16/20    Ent. 10/16/20 22:24:20    Pg. 6 of 26

1  Debtors various reserves and bank accounts to arbitrarily pay outstanding amounts due under the

2  Loan without providing any details to the Debtors until August 28, 2019, despite the Debtors'

3  repeated requests for information for weeks.

4       20.     On January 23, 2020, the Debtors and Rialto, on behalf of Lender, entered into a

5  Forbearance Agreement wherein Rialto agreed to forbear from exercising its rights and remedies

6  until July 23, 2020.  Upon execution of the Forbearance Agreement, the Debtors paid Lender the

7  amount of $447,764 to be applied to outstanding amounts due under the Loan.  In addition, the

8  Debtors brought current the past due monthly loan payments owed for November and December

9  2019, and January 2020 in the total amount of $192,012.69.  Thereafter, the Debtors were

10  required to make the regular principal and interest payments on the Loan.  Debtors were current

11  on the payments required under the Forbearance Agreement until the onset of the COVID-19

12  pandemic.  The American economy in general and the hotel industry in particular have been

13  decimated as a result of the pandemic and the applicable state and local stay at home orders.

14  Specifically, the pandemic and applicable stay at home orders caused a sudden and dramatic loss

15  of revenues and occupancy at the Hotel just when the Hotels would normally experience

16  increasing revenues coming out of winter and going into spring break.  As a result of the

17  COVID-19 pandemic and the immediate loss of revenue and occupancy as a result of the stay at

18  home orders, the Debtors unfortunately defaulted under the Forbearance Agreement.  The

19  Debtors are not unique among hotel owners and operators defaulting on loans and facing

20  foreclosure as a result of the COVID-19 pandemic.  A recent survey by the American Hotel and

21  Lodging Association estimated that half of hotel owners in the country are in danger of

22  foreclosure as a result of the pandemic. It is incumbent upon hospitality lenders to work with

23  their borrowers during these unfortunate times.

24       21.     Rialto scheduled non-judicial foreclosure sales of the Hotels, which were

25  continued and rescheduled from time to time, as follows:

26

| Debtor | Date of Foreclosure Sale |
| --- | --- |

DECLARATION OF LARRY CHANK IN
SUPPORT OF FIRST-DAY MOTIONS - 7

**STOEL RIVES LLP**
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

103715353.1 0070625-00002

| Shilo Ocean Shores | 10/16/2020 |
|---|---|
| Shilo Nampa Suites | 10/23/2020 |

22.    In addition to the payments under the Forbearance Agreement as set forth above, since the termination of the Forbearance Agreement, the Shilo organization paid to Rialto additional and substantial sums to postpone the foreclosures sales while the parties attempted to reach a further out-of-court agreement on restructuring the debts.  Additionally, SFI and SMC have forgone and not received franchise and management fees since at least September 2018 as part of Shilo's good faith effort to accomplish a successful restructuring.  When negotiations broke down, the Debtors determined in their reasonable business judgment that it would be best to file for chapter 11 bankruptcy protection for the benefit of all creditors, to save the jobs of the 41 employees who work at the Hotels, and to save the equity in the Hotels through a reorganization of their financial affairs in bankruptcy court.

## II.    CASH COLLATERAL

### A.    The Debtors' Primary Assets and Secured Debts

23.    Shilo Ocean Shores' primary asset is the Ocean Shores Hotel.  Based on the appraisal report of an MAI certified appraisal in 2015 when the Loan was originated, the Ocean Shores Hotel had a fair market value of $10,100,000, and Mark Hemstreet opines that the value is now at least $15,000,000.

24.    Shilo Nampa Suites' primary asset is the Nampa Suites Hotel.  Based on the appraisal report of an MAI certified appraisal in 2015 when the Loan was originated, the Nampa Suites Hotel had a fair market value of $5,100,000, and Mark Hemstreet opines that the value is now at least $7,000,000.

25.    The Lender's claims against Shilo Ocean Shores and Shilo Nampa Suites are cross-collateralized.  Combined, the Ocean Shores Hotel and Nampa Suites Hotel have a value

DECLARATION OF LARRY CHANK IN
SUPPORT OF FIRST-DAY MOTIONS - 8

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

103715353.1 0070625-00002

Case 20-42348-BDL    Doc 21    Filed 10/16/20    Ent. 10/16/20 22:24:20    Pg. 8 of 26

of $22,000,000, and the Lender's cross-collateralized secured claim is approximately $9,200,000, rendering an equity cushion of $12,800,000, which calculates to an equity cushion percentage of 139.13%. Even when using the higher secured claim amount of $11,687,709.90 (which includes various late fees, penalties, and other charges that the Debtors dispute) asserted by Lender and Rialto, the equity cushion is still $10,312,290.10, which calculated to an equity cushion percentage of 88.23%.

### B. Need for Use of Cash Collateral

26. The Debtors seek Court authority to use cash collateral in order to pay the expenses of maintaining and operating their businesses, as set forth in the Budgets, copies of which are attached as **Exhibit 1** to this declaration (the "Master Declaration"), through January 2021. The Budgets reflect the Debtors' ordinary and necessary operating expenses that must be paid for October and post-petition to preserve their businesses. While the Budgets represent the Debtors' best estimates of such expenses, the needs of the businesses may fluctuate. Thus, the Debtors seek authority to deviate from the total expenses contained in the Budgets by no more than 15% on a line-item basis and/or no more than 10% on a cumulative basis without the need for further Court order. The Debtors are seeking to use cash collateral across estates as the Loan is secured by both Nampa and Ocean Shores; nonetheless, each of the Debtors has its own Budget and will use its own cash collateral therein.

27. The Debtors believe that the current valuation of the Hotels on a going-concern basis and the continued operations of the Hotels provide adequate protection to the Lender and the other secured creditors. Hotel operations are a somewhat seasonal business, and although there is a dip in cash for the Debtors in this 13-week period, that is because the Hotels are entering their slowest seasons, and the cash balance will rise in the Spring and Summer.

28. If the Debtors are not permitted to use cash collateral to maintain and operate the Hotels, it is a virtual certainty that these estates would regrettably have to be liquidated. Specifically, without use of cash collateral and the ability to operate, existing guests will not

DECLARATION OF LARRY CHANK IN
SUPPORT OF FIRST-DAY MOTIONS - 9

**STOEL RIVES LLP**
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
*Telephone 206.624.0900*

103715353.1 0070625-00002

Case 20-42348-BDL    Doc 21    Filed 10/16/20    Ent. 10/16/20 22:24:20    Pg. 9 of 26

receive services and will depart, canceling existing charges. Moreover, without use of cash collateral, future reservations will also be cancelled. If the Debtors are not allowed to use cash collateral for even a limited period of time, the public perception associated with the foregoing will certainly hurt, if not eviscerate, the Debtors' businesses, thereby reducing the value of the estates and potential recovery to creditors.

**G.    Compliance with Rule 4001(c) of the Federal Rules of Bankruptcy Procedure**

29.    Pursuant to Rule 4001(c)(1)(B) of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), the Debtors submit that the relief requested by the Debtors pertaining to the use of cash collateral does not contain any of the following provisions, except as otherwise indicated below:

| **Provision** | |
|---|---|
| Cross-collateralization clauses | No [except to the extent that, Nampa and Ocean Shores were cross-collateralized pre-petition and, therefore, cash collateral may be cross-collateralized as a result thereof] |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the validity, perfection or amount of the secured party's pre-petition lien or debt or the waiver of claims against the secured creditor. | No |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the relative priorities of the secured party's pre-petition lien. | No |
| Provisions that operate, as a practical matter, to divest the Debtor of any discretion in the formulation of a plan or administration of the estate or to limit access to the court to seek any relief under other applicable provision of law. | No |
| Waivers of 11 U.S.C. § 506(c), unless the waiver is effective only during the period in which the Debtor is authorized to use cash | No |

DECLARATION OF LARRY CHANK IN
SUPPORT OF FIRST-DAY MOTIONS - 10

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
*Telephone 206.624.0900*

103715353.1 0070625-00002

Case 20-42348-BDL    Doc 21    Filed 10/16/20    Ent. 10/16/20 22:24:20    Pg. 10 of 26

| Provision | |
|---|---|
| collateral or borrow funds. | |
| Releases of liability for the creditor's alleged prepetition torts or breaches of Contract. | No |
| Waivers of avoidance actions arising under the Bankruptcy Code. | No |
| Provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt | No |
| Provisions that prime any secured lien | No |
| Automatic relief from the automatic stay upon default, conversion to chapter 7, or appointment of a trustee. | No |
| Waivers of procedural requirements, including those for foreclosure mandated under applicable non-bankruptcy law, and for perfection of replacement liens. | No |
| Adequate protection provisions which create liens on claims for relief arising under 11 U.S.C. §§ 506(c), 544, 545, 547, 548 and 549. | No |
| Waivers, effective on default or expiration, of the Debtor's right to move for a court order pursuant to 11 U.S.C. § 363(c)(2)(B) authorizing the use of cash collateral in the absence of the secured party's consent | No |
| Provisions that grant a lien in an amount in excess of the dollar amount of cash collateral authorized under the applicable cash collateral order. | No |
| Provisions providing for the paying down of prepetition principal owed to a creditor. | No |
| Findings of fact on matters extraneous to the approval process. | No |

### III.   CASH MANAGEMENT

30.     The Hotels are just a few of many hotels under the SFI brand.  Each of these hotels, including the Hotels, has its own separate bank account for receipts from operating activities (the "Depository Account(s)").  The Debtors will close the Depository Accounts and open post-petition debtor-in-possession accounts ("DIP Accounts") to use in place of the Depository Accounts.   Thereafter, the Debtors request permission to continue using their

DECLARATION OF LARRY CHANK IN
SUPPORT OF FIRST-DAY MOTIONS - 11

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone 206.624.0900

103715353.1 0070625-00002

Case 20-42348-BDL    Doc 21    Filed 10/16/20    Ent. 10/16/20 22:24:20    Pg. 11 of 26

existing cash management systems, wherein funds from each of these bank accounts are transferred to a master accounts payable bank account (the "Master A/P Account") held by Shilo Management Corporation ("SMC") to reimburse for expenses paid by SMC on behalf of the Hotels.  All expenses are paid by checks written from the Master A/P Account.  This results in cost savings and economies of scale by allowing all expenses and accounting to run through one account rather than several.

31.     Meticulous records of the bank accounts ensure that all funds are accounted for. In the ordinary course of business, SMC creates separate monthly reports for each of the separate hotel entities, including the Debtors, which it will continue to do throughout the bankruptcy cases in connection with reports to the United States Trustee.  SMC logs the individual transfers into the account as they are made, and the accounting system automatically registers checks written out of the account.  SMC produces a statement for the Debtors to show all monies in and out.

32.     Pursuant to the Motion each Debtor will open a debtor-in-possession bank account, but thereafter, the Debtors seek Court authority to maintain their prepetition cash management systems.  Specifically, the Debtors seek to collect income through each Debtor's debtor-in-possession bank accounts, then transfer the cash to the Master Account, from which all expenses for that Debtor will be paid.  Importantly, each Debtor will only transfer the exact amount necessary for the Master Account to cut checks for that Debtor's expenses.  All surplus income above what is needed for these expenses will remain in that Debtor's Depository Account.  Although the Debtors believe that there is no danger in the commingling and loss of estate funds by utilizing the Master A/P Account system, keeping all surplus income in each Debtor's account will serve as yet an extra safeguard to ensure that estate funds remain within the applicable estate and under the auspices of the Court and the Office of the United States Trustee.

## IV.     PREPETITION WAGES

DECLARATION OF LARRY CHANK IN
SUPPORT OF FIRST-DAY MOTIONS - 12

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

103715353.1 0070625-00002

Case 20-42348-BDL     Doc 21     Filed 10/16/20     Ent. 10/16/20 22:24:20     Pg. 12 of 26

33.     In the operation of the Hotels, the Debtors employ in the aggregate approximately 41 employees on the premises.  Each payroll covers a two-week period and is paid on the 17th day (Wednesday) after the end of each pay period.  The prepetition portion of the Debtors' unpaid payroll period is shown on **Exhibit 2** to the Master Declaration, including the dates covered, when Shilo does payroll, when Shilo cuts checks, initiates direct deposits, and funds payroll.  Collectively, this period is referred to as the "Prepetition Period" and the wages as the "Prepetition Wages."  The Debtors make payroll in two tranches.  Shilo Nampa Suites pays its staff and hotel managers on the same payroll together, with the next payroll due on October 21, 2020.  Shilo Ocean Shores pays its hotel managers on October 21, 2020, and its staff on October 28, 2020, with a recurring staggered payroll.    The Debtor submits that these hotel managers are not insiders because they do not have any control over the Debtors' financial affairs, budgeting, or macro-decisions, which are all made by the corporate office at SMC (the SMC corporate employees are paid by SMC, not the Debtors, and are not part of the Wage Motion).  The amounts on **Exhibit 2** represent the total gross amount of prepetition payroll, including workers compensation contributions, medical benefit contributions, federal and state withholding taxes, payroll taxes, and service fees to SMC.  None of the employees to be paid Prepetition Wages are insiders.  A redacted list of the employees and the amounts of the Prepetition Wages are shown on **Exhibit 2** to the Master Declaration.  The names of the employees have been redacted to protect their privacy, but an un-redacted version will be submitted to the U.S. Trustee, the Court, and Rialto, if requested.

34.     The Debtors make payments to the employees and all vendors through its cash management system, as described in more detail in a cash management motion filed concurrently with this Master Statement.  Pursuant to this cash management system, each Debtor transfers the exact amount of funds necessary to make payroll from its account to a master account payable bank account (the "Master Payroll Account") held by SMC, who then writes the employee checks from the Master Payroll Account.  This results in cost savings and

DECLARATION OF LARRY CHANK IN
SUPPORT OF FIRST-DAY MOTIONS - 13

103715353.1 0070625-00002

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

Case 20-42348-BDL    Doc 21    Filed 10/16/20    Ent. 10/16/20 22:24:20    Pg. 13 of 26

1  economies of scale by allowing all expenses and accounting to run through one account rather

2  than several.

3      35.    The source of funds to be used to honor the wages, salaries, commissions and

4  bonuses for the Prepetition Period will be the Debtors' revenue, which may constitute the cash

5  collateral of the Lender and a number of other secured creditors.  The Debtors' request to use

6  cash collateral is included in a separate motion filed concurrently herewith.

7      36.    By way of the Wage Motion, the Debtors seek authority to transfer the exact

8  amount of funds necessary to SMC for the express purpose of paying non-insider, Prepetition

9  Wages, within the limits of $13,650 per employee.

10     37.    All of the employees to which the Debtors seek to pay wages, salaries,

11  commissions, and bonuses for the Prepetition Period are still employed by the Debtors.  The

12  Debtors submit that approval to honor the employees' wages, salaries, commissions, and bonuses

13  for the Prepetition Period, including all federal and state withholding taxes, payroll taxes,

14  employer matching 401(k) contributions, and payroll service fees, will not render any estate

15  administratively insolvent.

16     38.    The Debtors' employees are integral to the Debtors' continued operation and the

17  generation of revenue, while preserving the value of all of the estates.  In short, the Debtors

18  cannot continue to operate and reorganize without the employees.  If the Debtors do not

19  continue to pay its employees their ordinary and earned wages, salaries, commissions, and

20  bonuses, the employees will likely quit.  Without employees, the Debtors' operations and the

21  value of their business will be severely impaired, if not eviscerated altogether.

22                        **V.    UTILITIES**

23     39.    To operate the Hotels, the Debtors receive water, gas, electricity, sewer, garbage

24  telephone, TV, movie/cinema, internet, and similar utility services from a number of utility

25  companies (each a "Utility Company," and collectively, the "Utility Companies").  Given the

26  importance of the services provided by the Utility Companies to the Debtors' businesses, it is

DECLARATION OF LARRY CHANK IN
SUPPORT OF FIRST-DAY MOTIONS - 14

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

103715353.1 0070625-00002
Case 20-42348-BDL    Doc 21    Filed 10/16/20    Ent. 10/16/20 22:24:20    Pg. 14 of 26

1   crucial that the means of providing adequate assurance to the Utility Companies which provide

2   utility services to the Debtors be determined so that there is no interruption in the services

3   provided.

4       40.    Prior to the commencement of the Debtors' bankruptcy cases, the Utility

5   Companies listed in **Exhibit 3** to the Master Declaration provided utility services to the Debtors.

6   The Debtors intend to provide adequate "assurance of payment" by providing each of the Utility

7   Companies listed in **Exhibit 3** with a cash deposit, as authorized by Section 366(c)(1)(A)(i) of

8   the Bankruptcy Code, in the amounts set forth in **Exhibit 3**, provided that the Debtors will

9   continue to utilize such services.  The proposed deposit amounts were determined based on an

10  average of the three (3) monthly ledgers reflecting expenses the Debtors incurred for the

11  respective Utility Companies.  To the extent that a deposit is already in place with a particular

12  Utility, such amount was deducted from the proposed deposit sought herein.  The source of funds

13  to be used to pay the cash deposits to the Utility Companies will be the Debtors' post-petition

14  revenues and cash on hand.

15              **VI.    JOINT ADMINISTRATION**

16      41.    These two Debtors each operate a Shilo Inn hotel pursuant to franchise

17  agreements with SFI, and they share common management, as each is managed by SMC.  The

18  Debtors are owned by Mark S. Hemstreet.  As such, the Debtors are "affiliates" of each other as

19  that term is defined under 11 U.S.C. § 101(2).

20      42.    The Debtors also share numerous creditors, including the primary secured

21  creditor, Lender, and the Loan is specially serviced by Rialto.  Most importantly, the Loan is

22  secured by both Hotels and personally guaranteed by Mark S. Hemstreet.

23      43.    Joint administration will avoid duplicative expenses and will ensure that creditors

24  in the Cases will receive appropriate notice of pertinent matters.  In addition, the Debtors believe

25  that joint administration of the Cases, including the use of a single pleadings docket, the

26  combining of notices to creditors of the different estates, and the joint handling of purely

DECLARATION OF LARRY CHANK IN
SUPPORT OF FIRST-DAY MOTIONS - 15

103715353.1 0070625-00002

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

Case 20-42348-BDL    Doc 21    Filed 10/16/20    Ent. 10/16/20 22:24:20    Pg. 15 of 26

administrative matters will aid in expediting the Cases and rendering the process less costly, without prejudicing the substantive rights of any creditor.

44. Additionally, the granting of the Motion will eliminate further need for the Debtors to file identical motions and orders in each of the Cases when seeking relief that is common to both Debtors, will avoid the further waste of judicial resources related to, for example, the docketing of identical motions, declarations and orders in the each of the Cases, and will permit the Debtors' estates to avoid the substantial copy costs and service costs associated with filing and serving motions and other pleadings in the Cases that seek collective relief for the Debtors.

45. Because the Debtors' primary secured debts are all owed to the same secured creditor and are cross-collateralized, the Debtors' plans of reorganization or section 363 sales will have to consider and address the secured debts of each other Debtor. Accordingly, joint administration of the Cases is of great importance not only at the outset but also as the Cases progress towards an exit strategy.

46. As a result, the Debtors hereby respectfully submit that cause exists to jointly administer the Cases.

## VII. CUSTOMER LOYALTY PROGRAM OBLIGATIONS

47. The Debtors' two hotels are just a few of 14 affiliated hotels under the SFI brand. The Star Program allows customers of Shilo Inns to earn 1 point per dollar spent on room rates per day, excluding tax and other expenses. For each 900 points gained, the customer can earn a free night at a Shilo Inn hotel. Accordingly, Shilo customers can also earn a variety of certificates with points ranging from 250-900, which is clearly stated on the Shilo Inn website under Star Rewards along with its terms and conditions. The Debtors submit that the Star Program provides benefits to all of the Debtors because it encourages customers to be loyal in choosing these two hotels over the many other hotel choices that they have in each region. Without the Star Program, it is almost certain that the Debtors will lose business and future

DECLARATION OF LARRY CHANK IN
SUPPORT OF FIRST-DAY MOTIONS - 16

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

103715353.1 0070625-00002

Case 20-42348-BDL    Doc 21    Filed 10/16/20    Ent. 10/16/20 22:24:20    Pg. 16 of 26

1  business from customers who would otherwise not have this incentive to be loyal in choosing

2  Shilo hotels.

3  48.  The Debtors submit that the discretion to honor the Star Program is essential to

4  the Debtors' maintenance of positive customer relations, as a failure to honor the existing Star

5  Program is certain to detrimentally affect customer goodwill and impair the Debtors' ability to

6  generate repeat business from the Debtors' customers.  If the Debtors are not authorized to honor

7  the Star Program in their discretion, the Debtors' ability to continue to generate business,

8  successfully reorganize and/or maximize value for creditors could be seriously jeopardized,

9  particularly where the underlying transaction involves long-standing, crucial customers.

10  49.  The Debtors engage in the Star Program in the ordinary course of their business.

11  The Debtors' most important clients are familiar with the Star Program and expect the benefits

12  they receive from them.  The success of the Debtors' business and the ability of the Debtors to

13  successfully reorganize and/or to maximize value for creditors are completely dependent upon

14  the loyalty, confidence, and continued patronage of their clients.  Any delay in honoring the Star

15  Program obligations likely will create immediate and irreparable customer dissatisfaction and

16  frustration, causing clients to offer their business to the Debtors' competitors.

17  50.  At a time when customer loyalty and patronage is critical to the Debtors'

18  reorganization efforts, the Debtors submit that it is entirely necessary, and appropriate, for the

19  Court to issue an order allowing the Debtors to continue to honor the Star Program in these

20  circumstances.

21  I declare under penalty of perjury under the laws of the United States of America that the

22  foregoing is true and correct to the best of my knowledge.

23  Executed on this 16th day of October 2020, at Portland, Oregon.

24

25  

26  LARRY CHANK

DECLARATION OF LARRY CHANK IN
SUPPORT OF FIRST-DAY MOTIONS - 17

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

103715353.1 0070625-00002

# Exhibit 1

# Shilo Inn Nampa Suites, LLC
## PROFORMA OPERATING STATEMENT PREPARED ON CASH FLOW BASIS
### October 16, 2020 to January 14, 2021

| | First Month by Week | | | | Proforma Operating Statement | | | Three Month Totals |
|---|---|---|---|---|---|---|---|---|
| | Week 1 10/16-22 | Week 2 10/23-29 | Week 3 10/30-11/5 | Week 4 11/6-12 | Weeks 1-4 Oct 16 - Nov 12 | Weeks 5-9 Nov 13 - Dec 17 | Weeks 10-13 Dec 18 - Jan 14 | |
| AVAILABLE ROOMS | 791 | 791 | 791 | 791 | 3,164 | 3,955 | 3,164 | 10,283 |
| ROOMS SOLD | 468 | 465 | 434 | 404 | 1,771 | 1,999 | 1,512 | 5,282 |
| COMP ROOM NIGHTS | 4 | 4 | 4 | 4 | 16 | 20 | 16 | 52 |
| TOTAL ROOMS OCCUPIED | 472 | 469 | 438 | 408 | 1,787 | 2,019 | 1,528 | 5,334 |
| AVERAGE DAILY RATE | $69.00 | $69.00 | $69.00 | $69.00 | $69.00 | $69.00 | $69.00 | $69.00 |
| AVERAGE DAILY RATE (incl comps) | $68.42 | $68.41 | $68.37 | $68.32 | $68.38 | $68.32 | $68.28 | $68.33 |
| OCCUPANCY % (rooms sold) | 59.2% | 58.8% | 54.9% | 51.1% | 56.0% | 50.5% | 47.8% | 51.4% |
| OCCUPANCY % (incl comps) | 59.7% | 59.3% | 55.4% | 51.6% | 56.5% | 51.0% | 48.3% | 51.9% |
| REVENUE PER AVAILABLE ROOM | $40.82 | $40.56 | $37.86 | $35.24 | $38.62 | $34.88 | $32.97 | $35.44 |
| **DEPARTMENTAL REVENUE** | | | | | | | | |
| ROOMS | 32,292 | 32,085 | 29,946 | 27,876 | 122,199 | 137,931 | 104,328 | 364,458 |
| MISCELLANEOUS | 888 | 882 | 824 | 767 | 3,360 | 3,793 | 2,869 | 10,023 |
| OCCUPANCY TAX COLLECTIONS [2] | 3,875 | 3,850 | 3,594 | 3,345 | 14,664 | 16,552 | 12,519 | 43,735 |
| GROSS REVENUE and OTHER CASH RECEIPTS | 37,055 | 36,818 | 34,363 | 31,988 | 140,223 | 158,276 | 119,716 | 418,216 |
| **COST OF GOODS / SERVICES SOLD** | | | | | | | | |
| ROOMS | 10,733 | 14,164 | 16,720 | 19,064 | 60,681 | 68,448 | 56,172 | 185,301 |
| MISCELLANEOUS | 311 | 309 | 288 | 268 | 1,176 | 1,328 | 1,004 | 3,508 |
| TOTAL COST OF GOODS / SERVICES SOLD | 11,044 | 14,473 | 17,008 | 19,332 | 61,857 | 69,776 | 57,176 | 188,809 |
| **DEPARTMENTAL PROFIT and OTHER CASH RECEIPTS** | | | | | | | | |
| ROOMS | 21,559 | 17,921 | 13,226 | 8,812 | 61,518 | 69,483 | 48,156 | 179,157 |
| MISCELLANEOUS | 577 | 574 | 535 | 498 | 2,184 | 2,466 | 1,865 | 6,515 |
| GROSS PROFIT | 26,011 | 22,345 | 17,355 | 12,655 | 78,366 | 88,500 | 62,540 | 229,407 |
| **GEN & ADMIN EXPENSE AND OTHER CASH OUTFLOWS** | | | | | | | | |
| ADVERTISING & PROMOTION | 1,991 | 2,978 | 1,846 | 2,919 | 9,734 | 9,503 | 6,432 | 25,669 |
| PROPERTY MAINTENANCE | 3,904 | 4,637 | 3,712 | 4,641 | 16,895 | 19,172 | 15,720 | 51,787 |
| GENERAL & ADMINISTRATIVE | 2,654 | 4,037 | 2,462 | 3,691 | 12,845 | 15,590 | 11,792 | 40,226 |
| UTILITIES (Week 2 figure represents est. deposits) | | 9,900 | | | 9,900 | 6,400 | 5,400 | 21,700 |
| INSURANCE | | | 3,970 | | 3,970 | 3,970 | 3,970 | 11,910 |
| SECURED PROPERTY TAX | | | | | | | | 0 |
| FRANCHISE FEES [4] | 1,292 | 1,283 | 1,198 | 1,115 | 4,888 | 4,888 | 5,517 | 15,293 |
| SMC MANAGEMENT FEE | 1,482 | 1,473 | 1,375 | 1,280 | 5,610 | 6,331 | 4,789 | 16,730 |
| OCCUPANCY TAX [2] | | | | 9,350 | 9,350 | 9,776 | 11,034 | 30,160 |
| TOTAL GENERAL & ADMINISTRATIVE EXPENSES AND OTHER CASH OUTFLOWS | 11,324 | 24,309 | 14,562 | 22,996 | 73,191 | 75,630 | 64,654 | 213,475 |
| NET CASH FLOW FROM OPERATIONS | 14,688 39.6% | (1,964) -5.3% | 2,793 8.1% | (10,341) -32.3% | 5,175 3.7% | 12,870 8.1% | (2,114) -1.8% | 15,931 3.8% |
| **Cash Beginning of Period** | 20,000 | 34,688 | 32,724 | 35,516 | 20,000 | 25,175 | 38,045 | |
| Change in period | 14,688 | (1,964) | 2,793 | (10,341) | 5,175 | 12,870 | (2,114) | |
| Cash End of Period | 34,688 | 32,724 | 35,516 | 25,175 | 25,175 | 38,045 | 35,931 | |
| **Trade Accounts Receivable Beginning of Period [4]** | 76,815 | 76,815 | 76,815 | 76,815 | 76,815 | 76,815 | 76,815 | |
| Change in period [5] | - | - | - | - | - | - | - | |
| Trade Accounts Receivable End of Period | 76,815 | 76,815 | 76,815 | 76,815 | 76,815 | 76,815 | 76,815 | |
| **Est. Inventory Beginning of Period [4]** | 31,250 | 31,250 | 31,250 | 31,250 | 31,250 | 31,250 | 31,250 | |
| Change in period [5] | - | - | - | - | - | - | - | |
| Inventory End of Period | 31,250 | 31,250 | 31,250 | 31,250 | 31,250 | 31,250 | 31,250 | |
| **FF&E (Est. FMV) Beginning of Period [4]** | 190,000 | 190,000 | 190,000 | 190,000 | 190,000 | 190,000 | 190,000 | |
| Change in period [5] | - | - | - | - | - | - | - | |
| FF&E End of Period | 190,000 | 190,000 | 190,000 | 190,000 | 190,000 | 190,000 | 190,000 | |
| **Real Property (FMV) Beginning of Period** | 7,000,000 | 7,000,000 | 7,000,000 | 7,000,000 | 7,000,000 | 7,000,000 | 7,000,000 | |
| Change in period [5] | - | - | - | - | - | - | - | |
| Real Property (FMV) End of Period | 7,000,000 | 7,000,000 | 7,000,000 | 7,000,000 | 7,000,000 | 7,000,000 | 7,000,000 | |
| TOTAL ALL ASSETS - END OF PERIOD | 7,332,753 | 7,330,789 | 7,333,581 | 7,323,240 | 7,323,240 | 7,336,110 | 7,333,996 | |

**Notes:**

1) Payroll expense is included in Rooms, A&G, Sales, & Maintenance departments as appropriate.

2) Occupancy tax payments are estimated at 8% of revenue and payments are based on the prior month's receipts.

3) Franchise fee is 4% of prior month's total revenue.

4) Estiamted balances as of 10/01/2020.

5) Net change is assumed to be zero each period.

# Shilo Inn Ocean Shores, LLC
## PROFORMA OPERATING STATEMENT PREPARED ON CASH FLOW BASIS
### October 16, 2020 to January 14, 2021

|  | First Month by Week | | | | Proforma Operating Statement | | | Three Month Totals |
|---|---|---|---|---|---|---|---|---|
|  | Week 1 10/16-22 | Week 2 10/23-29 | Week 3 10/30-11/5 | Week 4 11/6-12 | Weeks 1-4 Oct 16 - Nov 12 | Weeks 5-9 Nov 13 - Dec 17 | Weeks 10-13 Dec 18 - Jan 14 |  |
| AVAILABLE ROOMS | 791 | 791 | 791 | 791 | 3,164 | 3,955 | 3,164 | 10,283 |
| ROOMS SOLD | 336 | 279 | 215 | 312 | 1,142 | 1,006 | 1,021 | 3,169 |
| COMP ROOM NIGHTS | 4 | 4 | 4 | 4 | 16 | 20 | 16 | 52 |
| TOTAL ROOMS OCCUPIED | 340 | 283 | 219 | 316 | 1,158 | 1,026 | 1,037 | 3,221 |
| AVERAGE DAILY RATE | $116.00 | $116.00 | $116.00 | $116.00 | $116.00 | $105.00 | $110.00 | $110.57 |
| AVERAGE DAILY RATE (incl comps) | $114.64 | $114.36 | $113.88 | $114.53 | $114.40 | $102.95 | $108.30 | $108.79 |
| OCCUPANCY % (rooms sold) | 42.5% | 35.3% | 27.2% | 39.4% | 36.1% | 25.4% | 32.3% | 30.8% |
| OCCUPANCY % (incl comps) | 43.0% | 35.8% | 27.7% | 39.9% | 36.6% | 25.9% | 32.8% | 31.3% |
| REVENUE PER AVAILABLE ROOM | $49.27 | $40.92 | $31.53 | $45.75 | $41.87 | $26.71 | $35.50 | $34.08 |
| **DEPARTMENTAL REVENUE** | | | | | | | | |
| ROOMS | 38,976 | 32,364 | 24,940 | 36,192 | 132,472 | 105,630 | 112,310 | 350,412 |
| MISCELLANEOUS | 1,072 | 890 | 686 | 995 | 3,643 | 2,905 | 3,089 | 9,636 |
| OCCUPANCY TAX COLLECTIONS [2] | 4,677 | 3,884 | 2,993 | 4,343 | 15,897 | 12,676 | 13,477 | 42,049 |
| GROSS REVENUE and OTHER CASH RECEIPTS | 44,725 | 37,138 | 28,619 | 41,530 | 152,012 | 121,210 | 128,876 | 402,098 |
| **COST OF GOODS / SERVICES SOLD** | | | | | | | | |
| ROOMS | 18,145 | 12,567 | 7,184 | 10,175 | 48,071 | 42,552 | 37,061 | 127,684 |
| MISCELLANEOUS | 375 | 312 | 240 | 348 | 1,275 | 1,017 | 1,081 | 3,373 |
| TOTAL COST OF GOODS / SERVICES SOLD | 18,520 | 12,879 | 7,424 | 10,523 | 49,346 | 43,569 | 38,142 | 131,057 |
| **DEPARTMENTAL PROFIT and OTHER CASH RECEIPTS** | | | | | | | | |
| ROOMS | 20,831 | 19,797 | 17,756 | 26,017 | 84,401 | 63,078 | 75,249 | 222,728 |
| MISCELLANEOUS | 697 | 579 | 446 | 647 | 2,368 | 1,888 | 2,008 | 6,264 |
| GROSS PROFIT | 26,205 | 24,259 | 21,195 | 31,007 | 102,666 | 77,642 | 90,734 | 271,041 |
| **GEN & ADMIN EXPENSE AND OTHER CASH OUTFLOWS** | | | | | | | | |
| ADVERTISING & PROMOTION | 2,403 | 2,995 | 1,538 | 3,431 | 10,367 | 7,512 | 6,924 | 24,803 |
| PROPERTY MAINTENANCE | 4,454 | 4,660 | 3,300 | 5,325 | 17,739 | 15,853 | 16,540 | 50,133 |
| GENERAL & ADMINISTRATIVE | 3,204 | 4,060 | 2,050 | 4,375 | 13,689 | 11,939 | 12,694 | 38,322 |
| UTILITIES (Week 2 figure represents est. deposits) |  | 9,900 |  |  | 9,900 | 17,300 | 19,000 | 46,200 |
| INSURANCE |  |  | 8,280 |  | 8,280 | 8,280 | 8,280 | 24,840 |
| SECURED PROPERTY TAX |  |  | 49,923 |  | 49,923 | 0 | 0 | 49,923 |
| FRANCHISE FEES [3] | 1,559 | 1,295 | 998 | 1,448 | 5,300 | 5,299 | 4,225 | 14,824 |
| SMC MANAGEMENT FEE | 1,789 | 1,486 | 1,145 | 1,661 | 6,081 | 4,848 | 5,155 | 16,084 |
| OCCUPANCY TAX [2] |  |  |  | 9,350 | 9,350 | 17,221 | 13,732 | 40,303 |
| TOTAL GENERAL & ADMINISTRATIVE EXPENSES AND OTHER CASH OUTFLOWS | 13,409 | 24,397 | 67,234 | 25,590 | 130,629 | 88,253 | 86,550 | 305,432 |
| NET CASH FLOW FROM OPERATIONS | 12,796 28.6% | (138) -0.4% | (46,039) -160.9% | 5,417 13.0% | (27,964) -18.4% | (10,611) -8.8% | 4,184 3.2% | (34,391) -8.6% |
| Cash Beginning of Period | 80,000 | 92,796 | 92,659 | 46,620 | 80,000 | 52,036 | 41,425 |  |
| Change in period | 12,796 | (138) | (46,039) | 5,417 | (27,964) | (10,611) | 4,184 |  |
| Cash End of Period | 92,796 | 92,659 | 46,620 | 52,036 | 52,036 | 41,425 | 45,609 |  |
| Trade Accounts Receivable Beginning of Period [4] | 7,850 | 7,850 | 7,850 | 7,850 | 7,850 | 7,850 | 7,850 |  |
| Change in period [5] | - | - | - | - | - | - | - |  |
| Trade Accounts Receivable End of Period | 7,850 | 7,850 | 7,850 | 7,850 | 7,850 | 7,850 | 7,850 |  |
| Est. Inventory Beginning of Period [4] | 31,250 | 31,250 | 31,250 | 31,250 | 31,250 | 31,250 | 31,250 |  |
| Change in period [5] | - | - | - | - | - | - | - |  |
| Inventory End of Period | 31,250 | 31,250 | 31,250 | 31,250 | 31,250 | 31,250 | 31,250 |  |
| FF&E (Est. FMV) Beginning of Period [4] | 260,000 | 260,000 | 260,000 | 260,000 | 260,000 | 260,000 | 260,000 |  |
| Change in period [5] | - | - | - | - | - | - | - |  |
| FF&E End of Period | 260,000 | 260,000 | 260,000 | 260,000 | 260,000 | 260,000 | 260,000 |  |
| Real Property (FMV) Beginning of Period | 15,000,000 | 15,000,000 | 15,000,000 | 15,000,000 | 15,000,000 | 15,000,000 | 15,000,000 |  |
| Change in period [5] | - | - | - | - | - | - | - |  |
| Real Property (FMV) End of Period | 15,000,000 | 15,000,000 | 15,000,000 | 15,000,000 | 15,000,000 | 15,000,000 | 15,000,000 |  |
| TOTAL ALL ASSETS - END OF PERIOD | 15,391,896 | 15,391,759 | 15,345,720 | 15,351,136 | 15,351,136 | 15,340,525 | 15,344,709 |  |

**Notes:**

1) Payroll expense is included in Rooms, A&G, Sales, & Maintenance departments as appropriate.

2) Occupancy tax payments are estimated at 12% of revenue and payments are based on the prior month's receipts.

3) Franchise fee is 4% of prior month's total revenue.

4) Estiamted balances as of 10/01/2020.

5) Net change is assumed to be zero each period.

**Exhibit 2**

**Report:** Payroll Pay Statements: Default
**Grouped By:** Default Location
**Sorted By:** Last Name Ascending
**Filtered By:** Employee Filter: All Employees
**Date & Time:** 10/15/2020 08:17a
**Generated By:** Shelly J. Meyer
**Company:** SHILO INNS (6013713)

Default Location

Nampa Suites - 4R ACTUAL PAYROLL FOR PAY DATE OF 10/21/2020        PAYROLL PERIOD OF 9-/28/2020 TO 10/11/2020

| First Name | Last Name | Type | Status | # | Pay Date | Net Payment | Gross Payroll & Taxes | Employee Status | Date Terminated |
|---|---|---|---|---|---|---|---|---|---|
| | | Regular | Finalized | 793498 | 10/21/2020 | $553.74 | $692.18 | Active | |
| | | Regular | Finalized | 793499 | 10/21/2020 | $359.70 | $449.63 | Active | |
| | | Regular | Finalized | 793500 | 10/21/2020 | $716.85 | $896.06 | Active | |
| | | Regular | Finalized | 793501 | 10/21/2020 | $405.81 | $507.26 | Active | |
| | | Regular | Finalized | 793502 | 10/21/2020 | $660.73 | $825.91 | Active | |
| | | Regular | Finalized | 793503 | 10/21/2020 | $589.06 | $736.33 | Active | |
| | | Regular | Finalized | 793504 | 10/21/2020 | $525.01 | $656.26 | Active | |
| | | Regular | Finalized | 793505 | 10/21/2020 | $337.73 | $422.16 | Active | |
| | | Regular | Finalized | 793507 | 10/21/2020 | $636.48 | $795.60 | Active | |
| | | Regular | Finalized | 793506 | 10/21/2020 | $701.28 | $876.60 | Active | |
| | | Regular | Finalized | 793508 | 10/21/2020 | $736.24 | $920.30 | Active | |
| | | Regular | Finalized | 793509 | 10/21/2020 | $601.54 | $751.93 | Active | |
| | | Regular | Finalized | 793510 | 10/21/2020 | $909.19 | $1,136.49 | Active | |
| | | Regular | Finalized | 793511 | 10/21/2020 | $1,166.93 | $1,458.66 | Active | |
| | | Regular | Finalized | 793512 | 10/21/2020 | $1,525.51 | $1,906.89 | Active | |
| | | Regular | Finalized | 793513 | 10/21/2020 | $345.15 | $431.44 | Active | |
| | | Regular | Finalized | 793514 | 10/21/2020 | $749.03 | $936.29 | Active | |
| | | Regular | Finalized | 793515 | 10/21/2020 | $595.96 | $744.95 | Active | |
| | | Regular | Finalized | 793516 | 10/21/2020 | $313.66 | $392.08 | Active | |
| | | Regular | Finalized | 793517 | 10/21/2020 | $648.15 | $810.19 | Active | |
| | | Regular | Finalized | 793518 | 10/21/2020 | $714.68 | $893.35 | Active | |

Subtotal Full Payroll to be paid October 28, 2020        $13,792.43        $17,240.54

Accrued Payroll October 12, 13, 14, and 15th        $5,516.97        $6,896.22

Unpaid Accrued Payroll as of Oct 15 =        $19,309.402        $24,136.75

**Ocean Shores - OE ESTIMATED PAYROLL FOR PAYDATE OF 10/28/2020**  
**PAYROLL PERIOD OF 10/4/2020 TO 10/18/2020**

| Default Location | First Name | Last Name | Type | Status | # | Pay Date | Net Payment | Gross Payroll & Taxes | Employee Status | Date Terminated |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Regular | Finalized | 793356 | 10/28/2020 | $887.57 | $1,109.4625 | Active | |
| | | | Regular | Finalized | 793357 | 10/28/2020 | $911.67 | $1,139.5875 | Active | |
| | | | Regular | Finalized | 793358 | 10/28/2020 | $426.80 | $533.50 | Active | |
| | | | Regular | Finalized | 793359 | 10/28/2020 | $783.45 | $979.3125 | Active | |
| | | | Regular | Finalized | 793360 | 10/28/2020 | $800.65 | $1,000.8125 | Active | |
| | | | Regular | Finalized | 793361 | 10/28/2020 | $835.59 | $1,044.4875 | Active | |
| | | | Regular | Finalized | 793362 | 10/28/2020 | $498.75 | $623.4375 | Active | |
| | | | Regular | Finalized | 793363 | 10/28/2020 | $655.92 | $819.90 | Active | |
| | | | Regular | Finalized | 793364 | 10/28/2020 | $766.60 | $958.25 | Active | |
| | | | Regular | Finalized | 793365 | 10/28/2020 | $876.46 | $1,095.575 | Active | |
| | | | Regular | Finalized | 793366 | 10/28/2020 | $1,069.79 | $1,337.2375 | Active | |
| | | | Regular | Finalized | 793367 | 10/28/2020 | $681.92 | $852.40 | Active | |
| | | | Regular | Finalized | 793368 | 10/28/2020 | $571.33 | $714.1625 | Active | |
| | | | Regular | Finalized | 793369 | 10/28/2020 | $976.47 | $1,220.5875 | Active | |
| | | | Regular | Finalized | 793370 | 10/28/2020 | $1,005.88 | $1,257.35 | Active | |
| | | | Regular | Finalized | 793371 | 10/28/2020 | $684.58 | $855.725 | Active | |
| | | | Manual | Finalized | 793148 | 10/28/2020 | $148.39 | $185.4875 | Terminated | 09/23/2020 |
| | | | Regular | Finalized | 793372 | 10/28/2020 | $704.74 | $880.925 | Active | |
| | | | Regular | Finalized | 793373 | 10/28/2020 | $869.66 | $1,087.075 | Active | |
| | | | Regular | Finalized | 793374 | 10/28/2020 | $785.67 | $982.0875 | Terminated | 10/07/2020 |
| | | | | | | **Subtotal Full Payroll to be paid October 28, 2020** | **$14,941.89** | **$18,677.3625** | | |

**Unpaid Accrued Payroll as of Oct15 =**    **$13,447.70**    **$16,809.6263**

**Exhibit 3**

Shilo Inn, Nampa Suites, LLC
Utility Providers
As of October 15, 2020
4R

| Utility Provider Name | Type of Utility | Account No. | Location Served | Security Deposit? | Previous Bill (Month 1) | Previous Bill (Month 2) | Previous Bill (Month 3) | Proposed Cash Deposit | Utility Address | Utility Tel. No. |
|---|---|---|---|---|---|---|---|---|---|---|
| CenturyLink | telephone | 88901045 | Nampa Suites hotel | unknown | 441.61 | 477.27 | 489.08 | 469 | PO Box 52187, Phoenix, AZ 85072-2187 | 800.860.1020 |
| CenturyLink | internet | 89409866 | Nampa Suites hotel | unknown | 1114.36 | 1218.65 | 1203.29 | 1,179 | PO Box 52187, Phoenix, AZ 85072-2187 | 800.860.1020 |
| CenturyLink | telephone | 208-461-8960-4308 | Nampa Suites hotel | unknown | 257.62 | 255.69 | 259.56 | 258 | PO Box 2956, Phoenix, AZ 85062-2956 | 800.777.9594 |
| City of Nampa | water | 012486-000 | Nampa Suites hotel | unknown | 2106.77 | billed every 2 mos | 1130.24 | 809 | 401 3rd St. South, Nampa, ID 83651 | 208.468.5711 |
| City of Nampa | sewer | 012486-000 | Nampa Suites hotel | unknown | 5178.18 | billed every 2 mos | 2725.50 | 1,976 | 401 3rd St. South, Nampa, ID 83651 | 208.468.5711 |
| City of Nampa | garbage | 012486-000 | Nampa Suites hotel | unknown | 620.42 | billed every 2 mos | 620.42 | 310 | 401 3rd St. South, Nampa, ID 83651 | 208.468.5711 |
| Idaho Power Inc | electric | 36451900 | Nampa Suites hotel | unknown | 2451.41 | 3070.24 | 3028.96 | 2,850 | PO Box 34966, Seattle, WA 98124-1966 | 208.488.6151 |
| Intermountain Gas Company | gas | 32338030003 | Nampa Suites hotel | unknown | 548.08 | 458.25 | 610.68 | 539 | PO Box 5600, Bismarck, ND 58506-5600 | 208.377.6840 |

Shilo Inn, Ocean Shores, LLC
Utility Providers
As of October 15, 2020
OE

| Utility Provider Name | Type of Utility | Account No. | Location Served | Security Deposit? | Previous Bill (Month 1) | Previous Bill (Month 2) | Previous Bill (Month 3) | Proposed Cash Deposit | Utility Address | Utility Tel. No. |
|---|---|---|---|---|---|---|---|---|---|---|
| Centurylink | telephone | 819815895 | Ocean Shores hotel | unknown | 649.69 | 628.65 | 638.64 | 639 | PO Box 52187, Phoenix, AZ 85072-2187 | 800.860.1020 |
| Centurylink | telephone | 360 289 0277 778B | Ocean Shores hotel | unknown | 233.20 | 236.90 | 227.36 | 232 | PO Box 91155, Seattle, WA 98111-9255 | 800.777.9594 |
| Centurylink | telephone | 360 289 0347 807B | Ocean Shores hotel | unknown | 383.74 | 365.11 | 349.46 | 366 | PO Box 91155, Seattle, WA 98111-9255 | 800.777.9594 |
| City of Ocean Shores | water (irrigation) | 006435-000 | Ocean Shores hotel | unknown | 70.59 | 69.31 | 479.76 | 207 | PO Box 1539, Ocean Shores, WA 98569 | 360.289.2487 |
| City of Ocean Shores | water / sewer | 006439-000 | Ocean Shores hotel | unknown | 5660.33 | 6483.14 | 5643.02 | 5,929 | PO Box 1539, Ocean Shores, WA 98569 | 360.289.2487 |
| Coast Communications Co | internet | 003-007588 | Ocean Shores hotel | unknown | 452.30 | 462.30 | 452.30 | 456 | 349 Damon Rd NE, Ocean Shores, WA 98569 | 888.224.6502 |
| Grays Harbor PUD | electricity | 2454300000 | Ocean Shores hotel | unknown | 7131.08 | 7364.69 | 6334.24 | 6,943 | PO Box 510, Aberdeen, WA 98520-0115 | 360.533.7610 |
| Harbor Disposal Inc | garbage / recycle | 2186-93479 | Ocean Shores hotel | unknown | 1783.87 | 1766.21 | 1783.65 | 1,778 | PO Box 51006, Los Angeles, CA 90051-5306 | 360.533.1251 |
| Propane Etc | propane / gas | 5514 | Ocean Shores hotel | unknown | 1356.51 | 1159.58 | 1578.29 | 1,365 | PO Box 123, Aberdeen, WA 98520 | 360.533.7337 |